758 A.2d 539

## PRIMEHEALTH CORPORATION

v.

## INSURANCE COMMISSIONER OF the STATE of Maryland.

### Goldmark Friendship, LLC

v.

### Insurance Commissioner of the State of Maryland

### Christian E. Chinwuba

v.

### Insurance Commissioner of the State of Maryland.

Nos. 0793, 1867, 1868, Sept. Term, 1999.

Court of Special Appeals of Maryland.

Aug. 30, 2000.

376

378

Sunanda K. Holmes, Silver Spring, for appellants.

Christina Gerstung Beusch, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., on the brief), Baltimore, for appellee.

Argued before SONNER, KRAUSER and MARVIN H. SMITH (Retired, Specially Assigned), JJ.

SMITH, Judge.

In these consolidated appeals, PrimeHealth Corporation ("PrimeHealth"), Goldmark Friendship, L.L.C. ("Goldmark"), and Dr. Christian E. Chinwuba ("Dr. Chinwuba") challenge an order of the Circuit Court for Baltimore City striking or dismissing their petitions for judicial review of an order of the State Insurance Commissioner ("the Commissioner"). For the reasons discussed herein, they shall not prevail.

## FACTS

PrimeHealth is certified by the Commissioner as a health maintenance organization ("HMO")[1], and by the Department of Health and Mental Hygiene as a managed care organization ("MCO").[2] Goldmark, a Nevada Corporation, owns 100–per-

---

**1.** *See* Md.Code (1982, 1996 Repl.Vol.), § 19–707 of the Health–Gen. art. (setting forth requirement that HMO obtain certificate of authority from Commissioner).

**2.** *See* Code (1982, 1996 Repl.Vol., 1999 Cum.Supp.), § 15–101(f) of the Health–Gen. art. (defining "[m]anaged care organization" as, *inter alia,*

cent of PrimeHealth's shares. In turn, Dr. Chinwuba and his wife own 81–percent of the ownership interest in Goldmark. Dr. Chinwuba and his wife are members of PrimeHealth's board of directors.

In March of 1998, State Insurance Commissioner Steven B. Larsen directed the Maryland Insurance Administration ("the Administration") to conduct an examination of PrimeHealth's financial health.[3] The Administration thus examined a number of solvency and management issues. It presented a 59–page draft report to the Commissioner in June of 1998. Appended to the report were, among other things, the sworn testimonies of Dr. Chinwuba, PrimeHealth President Edward Thomas, and PrimeHealth Chief Financial Officer Albert St. Hillaire. The Administration determined that, both in order to qualify as an HMO and MCO and in response to the examination, PrimeHealth had overstated the value of its accounts receivable, overstated the values of various assets, and understated its liabilities. The Administration further determined that PrimeHealth had misrepresented its relationships with various other business entities and had used funds inappropriately, primarily in making payments to or on behalf of those entities.

The Administration concluded in the report that Prime-Health was insolvent, and that there were "grave concerns concerning the ability of the current management team to prudently manage the affairs of the Company, as well as whether the Company management meets the requisite tests of fitness and trustworthiness...." Much of the perceived wrongdoing was attributed to Dr. Chinwuba, whom the Administration characterized as "the principal and controlling owner of the Company."

The Commissioner provided PrimeHealth with a copy of the draft report in early August of 1998. Thereafter, on August

---

"[a] certified health maintenance organization that is authorized to receive medical assistance prepaid capitation payments").

**3.** *See* Code (1995, 1997 Repl.Vol.), § 2–205 of the Ins. art.

28, 1998, the Commissioner filed a complaint in the Circuit Court for Baltimore City, seeking an order that PrimeHealth show cause why the Commissioner should not be named its "Rehabilitator and Receiver." [4]

On September 4, 1998, PrimeHealth demanded that the Commissioner conduct a hearing on the draft report.[5] Prime-Health indicated that it "intend[ed] to challenge the findings and conclusions regarding solvency and the fitness of management. . . ." In response to PrimeHealth's demand, the Commissioner delegated Associate Deputy Commissioner Thomas Raimondi to conduct the hearing, and the hearing was scheduled for October 5 and 6, 1998. PrimeHealth filed exceptions to the draft report with the Commissioner on September 25, 1998.

Before the administrative hearing was held, however, and in response to the complaint filed by the Commissioner in the Circuit Court for Baltimore City, PrimeHealth President Edward Thomas signed, on PrimeHealth's behalf, a consent order which authorized the appointment of the Commissioner "as Receiver for the purpose of rehabilitation of . . . Prime-Health. . . ." The order, which was also signed for the court by Judge Joseph H.H. Kaplan and by Commissioner Larsen, was entered on October 1, 1998. It stated, in pertinent part:

> 2. The receiver shall have the powers and duties vested in him by the provisions of Title 9, Subtitle 2 of the Insurance Article, Annotated Code of Maryland, and § 19–706.1 of the Health–General Article, Annotated Code of

---

4. *See* Code (1995, 1997 Repl.Vol.), § 9–212 of the Ins. art. (regarding orders to rehabilitate, liquidate, or conserve insurers). *See also* Code (1982, 1996 Repl.Vol., 1999 Cum.Supp.), § 19–706.1 of the Health–Gen. art (specifically regarding orders to rehabilitate or liquidate HMO's); Code (1982, 1994 Repl.Vol., 1999 Cum.Supp.), § 15–102.3 of the Health–Gen. art. (establishing that "the provisions of § 19.706.1 . . . shall apply to managed care organizations in the same manner they apply to health maintenance organizations").

5. *See* Code (1995, 1997 Repl.Vol.), § 2–209(c)(2) of the Ins. art. (concerning demands for hearings on reports of examinations and investigations of Commissioner).

Maryland and shall forthwith take possession of the property of Defendant and shall conduct the business thereof under the general supervision of the Court, and take such steps toward the removal of the cause and conditions which have made rehabilitation necessary as the Court may direct. PrimeHealth's consent to this Order shall not be construed as an admission to any fact or allegation set forth in the Complaint for Rehabilitation and *shall not be construed as a waiver of any right that PrimeHealth may have to contest any action taken by the Receiver.*

(Emphasis added.)

In a letter to Deputy Commissioner Raimondi dated October 13, 1998, Assistant Attorney General Christina Gerstung Beusch, who represented the Commissioner, indicated that, when the consent order was entered in the trial court, the parties contemplated postponing the hearing until early December. Deputy Commissioner Raimondi thus notified Prime-Health that the hearing had been rescheduled for December 1, 2, and 3, 1998. By letter dated November 25, 1998, however, Ms. Beusch asked the Deputy Commissioner to cancel the hearing; in that

[t]he Insurance Commissioner, as Receiver for Prime-Health, is convinced that it is not in the financial interest of PrimeHealth in receivership, its members, and its creditors to expend resources litigating the Exceptions to the Draft Financial Examination Report. The Insurance Commissioner, as Receiver, believes that the Draft Financial Examination Report should be accepted without further modifications or additions.

Assistant Attorney General Beusch added: "In that the actions of the Receiver in conducting the business of Prime-Health are subject to the jurisdiction of the Circuit Court, these decisions should be reviewed by the Court which appointed the Commissioner as Receiver and which has jurisdiction over proceedings related to the rehabilitation."

In response to Ms. Beusch's letter, Deputy Commissioner Raimondi conducted a telephone conference with: Ms. Beusch;

Warren N. Weaver, who was counsel to PrimeHealth prior to the receivership; and the Regulations Coordinator for the Maryland Insurance Administration.[6] The Deputy Commissioner then canceled the administrative hearing. In a letter sent later that day to Ms. Beusch and Mr. Weaver, the Deputy Commissioner explained:

> ... In light of the placement of PrimeHealth into receivership and the appointment of the Insurance Commissioner as Receiver, I have determined that I no longer have jurisdiction to hear this matter. Pursuant to § 9–209 of the Insurance Article and Judge Kaplan's Order, the Circuit Court for Baltimore City has exclusive jurisdiction over the rehabilitation proceedings. I have also determined that the officers, directors, stockholders, members, subscribers, agents, and employees of PrimeHealth no longer have standing to take exceptions to the Draft Financial Examination Report. Pursuant to § 9–212 of the Insurance Article and Judge Kaplan's Order, the Insurance Commissioner is charged with conducting the business of PrimeHealth and any decision to take exceptions to the Draft Financial Examination Report would have to be made by the Insurance Commissioner. Judge Kaplan's Order expressly enjoins PrimeHealth and its officers, directors, stockholders, members, subscribers, agents, and employees from the transaction of PrimeHealth's business without the written consent of the Insurance Commissioner.

On December 31, 1998, Nathaniel Speights, Esq., who was then counsel for Dr. Chinwuba and Goldmark, sent to the Commissioner a three-inch binder containing, *inter alia*, an independent financial analysis as well as an "attestation" from

---

6. Prior to this telephone conference, Sunanda K. Holmes, Esq., who is counsel to all three appellants in this appeal, sent a letter to the Commissioner by which she informed him that she had learned that the administrative hearing would not be held and demanded, purportedly on behalf of those "owners, officers and directors of PrimeHealth who were maligned, slandered and defamed" in the report, that either the hearing be held or the draft report be withdrawn. Ms. Holmes did not disclose whom she purported to represent and was not counsel of record as to any of the appellants.

Dr. Chinwuba refuting certain allegations of misconduct. In a cover letter, counsel indicated that his clients hoped the information would "be considered during ... the Maryland Insurance Administration hearing (or court hearing) on the Limited Scope Examination dated March 31, 1998." Counsel did not demand a hearing on behalf of Dr. Chinwuba or Goldmark, however. The Maryland Insurance Administration thereafter submitted to the Commissioner an addendum to its draft report which, among other things, addressed and refuted the materials included in the binder. Both the binder and the addendum were appended to the draft report.

On March 3, 1999, the Commissioner filed a petition seeking the court's permission to finalize the draft report. The Commissioner pointed out that PrimeHealth had demanded an administrative hearing on the draft report but that the Commissioner had withdrawn the demand upon becoming rehabilitator. The court granted the petition in an order dated March 4, 1999, which stated that "the Commissioner may, pursuant to § 2–209 of the Insurance Article, file the Limited Scope Financial Examination Report as the Commissioner's final report." The Commissioner issued an order by which he adopted, and thereby finalized, the report on March 8, 1999.

On March 12, 1999, Dr. Chinwuba, through attorney Sunanda K. Holmes, moved for reconsideration of the March 4 order permitting the Commissioner to finalize the report. To date, the court has not ruled on Dr. Chinwuba's motion and Dr. Chinwuba has made no attempt to pursue the matter further.

On April 7, 1998, Dr. Chinwuba, through Sunanda K. Holmes, Esq., petitioned the court for judicial review of the Commissioner's order finalizing the report. On April 12, PrimeHealth, through attorneys Sunanda K. Holmes and Leonard L. McCants[7], also petitioned for judicial review of

---

7. The Commissioner informs us that, when the petition was filed, Mr. McCants was an officer and general counsel of PrimeHealth and was being paid a salary by PrimeHealth in rehabilitation. On April 20, 1999, eight days after PrimeHealth's petition was filed, the Commissioner, under the court's supervision, reached a severance agreement

the Commissioner's order. Goldmark, through Ms. Holmes alone, filed a similar petition for judicial review that same day. The Commissioner moved to strike PrimeHealth's petition and to thereby deny it relief. The court granted the motion on May 10, 1999. On June 3, 1999, PrimeHealth noted an appeal to this Court. The Commissioner further moved to dismiss the petitions filed by Dr. Chinwuba and Goldmark. The trial court granted the motion to dismiss Dr. Chinwuba's petition on September 7, 1999. It granted the motion to dismiss Goldmark's petition on September 9, 1999.[8] Dr. Chinwuba and Goldmark separately noted appeals to this Court on September 23, 1999.

The Commissioner informs this Court—and the appellants do not dispute—that Dr. Chinwuba and Goldmark have instituted various other related actions. For instance, a suit by Dr. Chinwuba against the Commissioner and the Maryland Insurance Administration for defamation and false light invasion of privacy is now pending in the Circuit Court for Baltimore City. Dr. Chinwuba has filed an action against Judge Kaplan alleging that the judge has not been impartial, and that suit is pending in the Circuit Court for Baltimore City as well.

Goldmark has filed, *inter alia*, a collateral action in the Circuit Court for Baltimore City seeking to terminate the receivership proceeding and challenging the validity of Prime-Health's consent to receivership. It has also filed, in the same court, a collateral action seeking to bar any sale of Prime-

---

with Mr. McCants that resulted in the termination of Mr. McCants' relationship with PrimeHealth.

8. Goldmark's petition was originally decided by the Honorable Hillary Caplan, who had not previously presided over any matter in the case and was apparently unaware of the receivership proceeding. Judge Caplan granted the petition and ordered the Commissioner to conduct a hearing on the finalization of the report. Upon Assistant Attorney General Beusch's request, however, the matter was specially assigned to Judge Joseph H.H. Kaplan, who vacated Judge Caplan's order and dismissed the petition.

Health by way of a stock purchase agreement as part of a rehabilitation plan.

Dr. Chinwuba and Goldmark, together, have sued the Commissioner as rehabilitator and various other persons in the Circuit Court for Baltimore City for alleged violations of their constitutional rights in the establishment and administration of the receivership. A similar suit filed in federal court was dismissed, and no appeal has been filed from that dismissal.

## ISSUES

Appellants argue, in essence, that they properly demanded an administrative hearing on the report and properly petitioned for judicial review from the Commissioner's order finalizing the report without a hearing, and that the trial court therefore erred in striking or dismissing their petitions.[9] The

9. Specifically, the appellants phrase the issues on appeal as follows:

I. The Trial Court Erred In Striking And Dismissing PrimeHealth, GoldMark And Dr. Chinwuba's Petitions For Judicial Review Of The Insurance Commissioner's March 8, 1999 Order....

A. Judge Kaplan's March 4, 1999 Order Finalizing The Limited Scope Examination Report Was Erroneous, Abuse Of Discretion And Constituted Plain Error Of Law....

B. The Attorney General's Office Has A Conflict Of Interest In Representing Both PrimeHealth Corporation And The Maryland Insurance Commissioner In The Same Proceedings Before The Trial Court....

C. Trial Court Erred In Dismissing PrimeHealth, GoldMark And Dr. Chinwuba's Petition For Judicial Review....

D. Maryland Insurance Code Absolutely Guaranteed A Hearing On The Draft Limited Scope Financial Examination Report When A Request For Hearing Has Been Made....

E. The Commissioner Cannot Cancel A Statutory Mandated Hearing, By Giving Himself Consent To Waive A Right Which His Own Agreement Preserved From Such Waiver....

F. The Commissioner's Attempted Finalizing Of Official Condemnation Of Dr. Chinwuba Personally, Violated His Due Process Rights And Assures His Standing....

1. The Official Condemnation of Dr. Chinwuba Personally, On The Charge He Made "Demonstrably False And Misleading" Sworn Statements, Assures Dr. Chinwuba's Standing Under Maryland Administrative Law....

2. Mere filing Dr. Chinwuba's Written Submissions, And A *Pro Forma* Submission To The Circuit Court Administrative Judge, Was

Commissioner counters that PrimeHealth's petition was properly struck and that the petitions of Goldmark and Dr. Chinwuba were properly dismissed. The Commissioner posits that the petitions were, in actuality, collateral challenges to the trial court's March 4, 1999 order authorizing the finalization of the report. He contends that the only proper way to lodge an appellate challenge to the March 4 order was to appeal the March 4 order. In the alternative, the Commissioner argues that only the Commissioner as rehabilitator of PrimeHealth, and not PrimeHealth itself, was entitled to pursue an administrative hearing on the report once the consent order was entered. The Commissioner contends that neither Goldmark nor Dr. Chinwuba was ever entitled to a hearing on the report. We agree that the trial court properly disposed of the petitions, although we do not accept all of the arguments propounded by the Commissioner.

## DISCUSSION

Preliminarily, although the Commissioner does not raise this argument, there is considerable question as to whether the petitions for circuit court review filed by PrimeHealth and Goldmark were timely.

Md. Rule 7-203 directs that

a petition for judicial review shall be filed within 30 days after the latest of:

(1) the date of the order or action of which review is sought;

(2) the date of the administrative agency sent notice of the order or action to the petitioner, if notice was required by law to be sent to the petitioner; or

(3) the date the petitioner received notice of the agency's order of action, if notice was required by law to be received by the petitioner.

------

No Substitute For The Canceled Contested–Case Hearing Guaranteed By Statute, And, For Dr. Chinwuba, By Due Process.

The Commissioner's order finalizing the report is dated March 8, 1999, and the parties agree that the Commissioner "issued" the order on that date. Dr. Chinwuba's petition for judicial review was filed in the circuit court on April 7, 1999. PrimeHealth's and Goldmark's petitions were not filed until April 12, 1999—35 days after the date of the Commissioner's order.

Although the parties direct this Court to several provisions that require the Commissioner to give a copy of a draft report to the person examined at least 30 days before the report is finalized, *see* § 2–209(c)(1) of the Ins. art., Vol. 1; Md. Regs. Code tit. 31, § 04.01.03 C, they direct us to no provision that would require notice to any person once the report is actually finalized. We are aware of no such provision.

It thus appears that the petitions of PrimeHealth and Goldmark were untimely. Because the Commissioner has not raised this matter, we shall assume *arguendo* that the petitions *were* timely and shall affirm on other grounds the trial court's disposition of the petitions.

### —Appealability of Trial Court's March 4, 1999 Order—

The Commissioner contends that the instant appeals are nothing more than improper collateral attacks on the trial court's March 4, 1999 order, by which the court, in the Commissioner's view, "authorized the Commissioner to make the Report final." The Commissioner argues that, had the appellants wanted to challenge that order, they should have appealed from it.[10] We disagree and observe that the Commissioner mischaracterizes the substance of the March 4 order.

---

**10.** The Commissioner points out that Dr. Chinwuba filed a motion for reconsideration of the March 4 order, and that the motion has not yet been decided. The Commissioner contends that, that being the case, "the time for appealing the March 4 order[, at least as to Dr. Chinwuba,] has not even begun, and the issue is simply not ripe for this Court's review." As we shall explain, *infra*, the March 4 order was not a final judgment from which an appeal could lie, regardless of the status of the motion for reconsideration.

■ When the Commissioner acts as a rehabilitator in a receivership proceeding pursuant to § 9–212 of the Insurance Article and §§ 15–102.2 [11] and 19–706.1 of the Health General Article, he wears, in effect, two hats. On the one hand, he remains responsible for exercising the usual powers and performing the usual duties of the Maryland Insurance Administration. *See* Code (1995, 1997 Repl.Vol., 1999 Cum.Supp.), § 2–103 of the Ins. art., Vol. 1 (setting forth the powers and duties of the Commissioner). On the other hand, upon being appointed the rehabilitator of an insurer, the Commissioner must also "take possession of the property of the insurer and conduct the business of the insurer under the general supervision of the court." § 9–212(a)(ii) of the Ins. art., Vol. 1. A Commissioner as rehabilitator "steps into the shoes of the insurer." 1 Lee R. Russ & Thomas F. Segalia, *Couch on Insurance* § 5:22 at 5–41 (1997). *See also* 44 C.J.S. *Insurance* § 170 at 332 (1993). "He is charged with a duty to act with a broad view toward minimizing financial harm to all policyholders, creditors, and the general public." *Id.*

■ The Commissioner oversees examinations of insurers and finalizes reports based on such examinations on a regular basis, regardless of whether the examinations lead to receivership proceedings. *See generally* §§ 2–205 and 2–209 of the Ins. art., Vol. 1. Thus, the Commissioner exercised a usual power and performed a usual duty of his office when he finalized the report. He performed a function that he was authorized by statute to perform without court supervision, rather than a rehabilitative function that required the court's approval. To the extent that the trial court's March 4, 1999 order purported to authorize the finalization of the report, the order was superfluous.

■ The Commissioner wore the hat of a rehabilitator, however, when he withdrew PrimeHealth's demand for an administrative hearing on the finalization of the report. Thus,

---

11. Code (1982, 1994 Repl.Vol., 1999 Cum.Supp.), § 15–102.2 of the Health–Gen. art., Vol. 1.

the Commissioner was required to obtain the court's permission to withdraw the demand. In substance, that is precisely what the Commissioner obtained with the March 4, 1999 order. In his petition seeking the court's permission to finalize the report, the Commissioner made clear that PrimeHealth had demanded an administrative hearing prior to the receivership, and that the Commissioner had withdrawn the demand upon becoming rehabilitator. Arguably, the Commissioner as rehabilitator might have more properly sought the court's permission to withdraw the demand for a hearing before the withdrawal was requested of Deputy Commissioner Raimondi, who was to have presided over the administrative hearing, rather than when the report was about to be finalized by the Commissioner in the course of his usual duties. Because it is clear that the result would have been the same—*i.e.* the court would have granted the Commissioner as rehabilitator permission to withdraw PrimeHealth's demand for a hearing—we are not troubled by the procedure employed by the Commissioner as rehabilitator.

 Section 9–216 of the Insurance Article provides:

An appeal may be taken to the Court of Special Appeals from:

(1) an order that grants or refuses rehabilitation, liquidation, or conservation; and

(2) *any other order in a delinquency proceeding that has the character of a final order as to the particular part of the delinquency proceeding covered by the order.*

Code (1995, 1997 Repl.Vol.), § 9–216 of the Ins. art., Vol. 1 (emphasis added). While the Commissioner as rehabilitator was required to obtain the court's permission before conducting any business on behalf of PrimeHealth, including the withdrawal of the demand for an administrative hearing, the court's March 4, 1999 order granting permission to withdraw the demand did not resolve any portion of the receivership proceeding. As a general rule, when a Commissioner is appointed to rehabilitate an insurer in a receivership proceeding and is authorized

to work out a rehabilitation plan[, the . . . ] proceeding . . . is but one proceeding until the proposed plan is ultimately passed on, and intervening orders are merely preliminary orders which may be considered on appeal from the order affirming the rehabilitation plan.

44 C.J.S. *Insurance* § 173 at 336. Thus, contrary to the Commissioner's suggestion, the court's March 4, 1999 order, authorizing the Commissioner as rehabilitator to withdraw PrimeHealth's demand for an administrative hearing, was not a final and appealable order.

That is not to say that a person entitled to demand a hearing in this case would be required to wait until a rehabilitation plan is affirmed by the court before it could appeal the Commissioner's finalization of the report. As we have explained, the Commissioner wears two hats in a receivership proceeding. When he finalized the report in the case *sub judice*, he was wearing the hat of the State Insurance Commissioner. Section 2–215(a)(2) of the Insurance Article authorizes an appeal to the circuit court from "a refusal by the Commissioner to grant a hearing" in regard to a report. *See* Code (1995, 1997 Repl.Vol., 1999 Cum.Supp.), § 2–215(a)(2) of the Ins. art., Vol. 1. As the appellants properly recognize, such an appeal may be secured by petition for judicial review. *See* Md. Rules 7–202 and 7–203. Of course, if PrimeHealth were entitled to demand a hearing—and we shall hold, *infra*, that it was not—and if the court were to approve a plan for rehabilitation while PrimeHealth's petition challenging the Commissioner's finalization of the report was pending, the Commissioner might attempt to invoke as to PrimeHealth the doctrines of *res judicata* and collateral estoppel. *See Mackall v. Zayre Corp.*, 293 Md. 221, 227–28, 443 A.2d 98, 101–02 (1982) (" 'If the second suit is between the same parties and is upon the same cause of action, a judgment in the earlier case on the merits is an absolute bar, not only as to all matters which were litigated in the earlier case, but as to all matter which could have been litigated [res judicata]. If, in a second suit between the same parties, even though the cause of action is different, any determination of fact, which was actu-

ally litigated in the first case, is conclusive in the second case [collateral estoppel]' " (citations and emphasis omitted; brackets in original)); *Queen City Enter., Inc. v. Independent Theatres, Inc.*, 230 Md. 387, 394, 187 A.2d 459, 463 (1963) ("*[R]es judicata* is not applicable where the judgment is not a final one ..."); 13 M.L.E. *Judgments* § 84 at 453 (1999) ("A judgment that is merely interlocutory constitutes no bar to a subsequent action").

### —Standing to Demand Administrative Hearing—

#### *PrimeHealth*

The Commissioner further argues that, once the consent order was entered, only the Commissioner as rehabilitator, if he so desired, could pursue an administrative hearing on the report. The Commissioner posits that PrimeHealth itself could not pursue an administrative hearing and therefore could not properly petition for judicial review of the Commissioner's failure to conduct a hearing.

Ordinarily, if the Commissioner believes an insurer is in financially hazardous condition, the Commissioner will commence delinquency proceedings against it. *See* Code (1995, 1997 Repl.Vol.), §§ 9–101—9–212 of the Ins. art., Vol. 1.; § 15–102.2 of the Health–Gen. art., Vol. 1; § 19–706.1 of the Health–Gen. art., Vol. 2. If the insurer is unable to convince the court that the proceedings are unfounded, the court will appoint the Commissioner to rehabilitate or liquidate the insurer. *See* §§ 9–210—9–212 of the Ins. art., Vol. 1. In the instant case, of course, when confronted with the draft report, PrimeHealth consented to the receivership with the Commissioner as rehabilitator.

 Regardless of whether a receivership is consensual or non-consensual, the role of the Commissioner as rehabilitator is the same. "An order of rehabilitation must be read in connection with the provisions of the authorizing statute." 1 *Couch on Insurance* § 5:21 at 5–38. In accordance with § 9–212(a)(1) of the Insurance Article, Vol. 1, the order authorizing the receivership shall:

(i) appoint the Commissioner as rehabilitator;

(ii) direct the Commissioner:

1. to take possession of the property of the insurer and conduct the business of the insurer under the general supervision of the court; and

2. to take action as the court directs to remove the causes and conditions that have made rehabilitation necessary;

(iii) vest title to all property of the insurer in the rehabilitator; and

(iv) require the rehabilitator to make accountings to the court that:

1. are at intervals as the court specifies in its order, but not less frequently than two times each year; and

2. include the opinion of the rehabilitator about the likelihood of the success of the rehabilitation.

*See also* §§ 15–102.2, Vol. 1, and 19–706.1, Vol. 2, of the Health–Gen. art. (setting forth additional actions the Commissioner may take when the insurer is an HMO or MCO). Indeed, the consent order signed by PrimeHealth, the Commissioner, and the court reiterates the statutory requirements almost verbatim.

 As Deputy Commissioner Raimondi recognized when he canceled the administrative hearing upon the request of the Commissioner as rehabilitator, it is axiomatic that, once the Commissioner becomes rehabilitator of an insurer, "the officers, directors, stockholders, members, subscribers, agents, and employees" are no longer authorized to act on the insurer's behalf. In accordance with § 9–212(b)(1)(ii) of the Insurance Article, only an order to terminate the receivership proceeding "allows the insurer to resume possession of its property *and the conduct of its business*." (Emphasis added.) *See generally* 43 Am.Jur.2d *Insurance* § 91 at 170 (1982) ("After a rehabilitator has been appointed, the officers and directors cannot manage the affairs of the company"); 1 *Couch on Insurance* § 5:22 at 5–42 ("The [Commissioner as rehabilitator] assumes to a great extent the powers that were

vested in the corporation"). *See, e.g., Kentucky Central Life Ins. Co. v. Stephens,* 898 S.W.2d 83, 85 (Ky.1995) ("The board of directors is without authority in a rehabilitation action other than the right to defend against the petition for liquidation"). Once a Commissioner is appointed receiver, he has

> the duty to act with a broader view toward minimizing inevitable financial harm to *all* policy holders, creditors, and the general public.... Implicit is the realization that when an insurance company is under threat of insolvency, or in a financially "hazardous" condition, ... individual interests may need to be compromised in order to avoid greater harm to a broader spectrum of policyholders and the public.

*Vickodil v. Pennsylvania Ins. Dep't.,* 126 Pa.Commw. 390, 396–97, 559 A.2d 1010, 1013 (1989) (emphasis in original) (citations omitted).

 In Paragraph 2 of the consent order, PrimeHealth expressly recognized that the Commissioner "shall have the powers and duties vested in him by the provisions of Title 9, Subtitle 2 of the Insurance Article, Annotated Code of Maryland, and § 19–706.1 of the Health–General Article, Annotated Code of Maryland." The final sentence of paragraph 2 states, however, that "PrimeHealth's consent to this Order ... shall not be construed as a waiver of any right that PrimeHealth may have to contest any action taken by the Receiver." The appellants contend that this final sentence grants PrimeHealth the right to challenge the Commissioner's decision to withdraw its demand for an administrative hearing.[12] The argument is without merit.

---

12. The appellants also suggest that authority to appeal from a Commissioner's actions during the course of a receivership is granted by Code (1995, 1997 Repl.Vol.), § 9–104 of the Ins. art., Vol. 1. To the contrary, § 9–104 authorizes an appeal from an order of the Commissioner issued after the Commissioner has determined that "operation of an authorized insurer may be hazardous to policyholders or creditors of the authorized insurer or the general public," *id.,* § 9–103, but before a delinquency action, which could result in the appointment of the Commissioner as rehabilitator, is instituted.

�In Prior to signing the consent order, PrimeHealth did indeed have the right to demand an administrative hearing on the draft report. *See* § 2–209(c) of the Ins. art., Vol. 1. It would have had the right to contest an order of the Commissioner resulting from such a hearing, or the Commissioner's refusal to grant a hearing, provided the order was issued or the refusal occurred before the Commissioner was appointed receiver. *See* § 2–215(a) and (b) of the Ins. art., Vol. 1. Under the statutory scheme, however, an insurer in receivership does *not* have the right to contest an action by the Commissioner as rehabilitator, short of petitioning, as an "interested person," for a court order terminating the receivership proceeding. *See generally* § 9–212(b)(1)(ii) of the Ins. art., Vol. 1.

█ We are convinced that PrimeHealth could not create a right to contest an action of the Commissioner as rehabilitator by consenting to the receivership and attempting to reserve any rights it may have had prior to the receivership. The General Assembly enacted the statutes that authorize the Commissioner to act as rehabilitator or liquidator to ailing HMOs and MCOs so that "the Commissioner would be able to act quickly to protect the interest[s] of health maintenance organization members or of creditors," and thereby to prevent "much public harm." Floor Report to House Bill 324 of the 1986 Legislative Session (on which 1986 Laws of Maryland, Chapter 441, which enacted § 19–706.1 of the Health–General Article, was based). It may be inferred, from the absence of any provisions setting forth circumstances under which prior management of an insurer in receivership may contest the actions of the Commissioner as rehabilitator, that the General Assembly intended for the Commissioner to act without interference from those who previously managed—or mismanaged—the company. *Cf. Stanford v. Maryland Police Training and Correctional Comm'n,* 346 Md. 374, 379, 697 A.2d 424, 426 (1997) (" 'That which necessarily is implied in the statute is as much a part of it as that which is expressed' " (emphasis and citation omitted)). If an insurer is permitted to create a right to challenge the Commissioner as rehabilitator simply by consenting to an inevitable receivership and inserting a reser-

vation clause into the consent order, the intent of the General Assembly would be frustrated.

 In sum, once the consent order was entered, Prime-Health had no right to pursue an administrative hearing on the report unless the Commissioner as rehabilitator chose to do so on its behalf. Nor could PrimeHealth reserve, in the consent order, a right to contest any action of the Commissioner as rehabilitator, such as the withdrawal of Prime-Health's demand for a hearing. Had PrimeHealth wanted to challenge the report, it should not have consented to the receivership.

### Goldmark and Dr. Chinwuba

 The appellants argue that Goldmark and Dr. Chinwu-ba were entitled in their own right, pursuant to either § 2–209 or § 2–210 [13] of the Insurance Article, to an administrative hearing on the report. The Commissioner posits that neither statute provides standing to Goldmark or Dr. Chinwuba.

### —§ 2–209—

Section 2–209(c) of the Insurance Article provides:

*Procedures before filing proposed report.*—(1) At least 30 days before filing a proposed examination report with the Commissioner, the Commissioner shall give a copy of the proposed report to the *person that was examined.*

(2) If *the person* requests a hearing in writing within the 30–day period, the Commissioner:

(i) shall grant a hearing on the proposed report; and

(ii) may not file the proposed report until after:

1. the hearing is held; and

---

13. Code (1995, 1997 Repl.Vol.), § 2–210 of the Ins. art., Vol. 1.

2. any modifications of the report that the Commissioner considers proper are made.

(Emphasis added.)

Section 2–209 is based on former Art. 48A, § 34. The former section was repealed and re-enacted by 1995 Laws of Maryland, Chapter 36, as part of the code revision process. At that time, the word "person" was substituted for "insurer." A Special Revisor's Note following § 2–209 explains that the change was made because "persons other than an insurer may be examined under § 2–205 of this subtitle...." Section 2–205(a)(1), in turn, authorizes the Commissioner to

examine the affairs, transactions, accounts, records, and assets of each:

(i) authorized insurer;

(ii) management company of an authorized insurer;

(iii) subsidiary owned or controlled by an authorized insurer; or

(iv) rating organization.

see generally *Blevins v. Baltimore County*, 352 Md. 620, 642, 724 A.2d 22, 32 (1999) ("[T]he principal function of code revision 'is to reorganize the statutes and state them in simpler form,' and thus 'changes are presumed to be for the purpose of clarity rather than for a change in meaning'" (citations omitted)).

Neither Goldmark nor Dr. Chinwuba could be a "person that was examined" within the meaning of § 2–209(c), in that neither is an authorized insurer, a management company of an authorized insurer, a subsidiary owned or controlled by an authorized insurer, or a rating organization. More important, neither Goldmark nor Dr. Chinwuba *was* the subject of the examination that resulted in the report. PrimeHealth was the only subject. Thus, neither Goldmark nor Dr. Chinwuba was entitled to demand a hearing under § 2–209(c).

—§ 2–210—

Section 2–210(a)(2)(ii) of the Insurance Article directs: "The Commissioner shall hold a hearing . . . on written demand by a person aggrieved by any act of, threatened act of, or failure to act by the Commissioner or any report, regulation, or order of the Commissioner, except an order to hold a hearing or an order resulting from a hearing." Section 2–210(b)(1) states: "A demand for a hearing shall state the ground for the relief to be demanded at the hearing." *See* Md. Regs.Code tit. 31, § 04.01.03 C(3) (specifying that demand for hearing be in writing).

Assuming, without deciding, that Goldmark and Dr. Chinwuba are "person[s] aggrieved" by the report and as such were entitled to a hearing § 2–210(a)(2)(ii)—or that they had standing to demand a hearing based on some other ground, as set forth in their brief [14]—the argument nevertheless fails. Nothing in the joint record extract or the statements of facts set forth by the parties in their briefs indicates that Goldmark or Dr. Chinwuba ever properly demanded a hearing on their own behalves, in their status as individuals separate and apart from PrimeHealth.

As we have observed, Sunanda K. Holmes, Esq. sent a letter to the Commissioner shortly after Deputy Commissioner Raimondi canceled the scheduled hearing. In her letter, Ms. Holmes stated that "the owners, officers, and directors of PrimeHealth who were maligned, slandered, and defamed" in the report demanded a hearing. As Assistant Attorney General Beusch pointed out for the Commissioner in a letter responding to Ms. Holmes' letter, Ms. Holmes never revealed the identities of her clients. There is no indication that, at that time, Ms. Holmes was authorized to make a demand on anyone's behalf. Although Ms. Holmes represents Goldmark and Dr. Chinwuba, as well as PrimeHealth, in this appeal, she apparently did *not* represent them when she sent the demand

---

14. The appellants contend that the report contained an "official condemnation" of Dr. Chinwuba, and that the condemnation triggered, for Dr. Chinwuba, a Constitutional due process right to a hearing.

letter. Approximately one month after Ms. Holmes sent the letter to the Commissioner, Nathaniel Speights, Esq., sent to the Commissioner, on behalf of Goldmark and Dr. Chinwuba, a binder of additional information. In a cover letter, Speights stated: "As you know, *this* office represents Goldmark Friendship LLC and Dr. Christian Chinwuba." (Emphasis added.) Although Speights indicated that his clients wanted the information contained in the binder to be used at "the hearing," he did not actually request a hearing and certainly did not "state the ground for the relief to be demanded at the hearing," as required by § 2-210(b)(1).

### —Role of Attorney General—

■ Our determination that the trial court properly disposed of the petitions makes it is unnecessary to address the appellants' argument that Assistant Attorney General Beusch's representation of both the Commissioner and Prime-Health in receivership was improper due to a conflict of interest. We nevertheless observe that the contention is without merit.

■ The appellants misunderstand the relationships between the parties and Ms. Beusch. Ms. Beusch represents only the Commissioner. As we have explained, when the Commissioner is appointed receiver of a troubled insurer, he continues to exercise his usual powers and perform his usual duties. At the same time, he wears the hat of rehabilitator. Section 2-103(c) of the Insurance Article requires that "[t]he Commissioner shall devote full time to the duties of office." Section 9-212(a) requires that an order to rehabilitate an insurer "shall ... appoint the Commissioner as rehabilitator." It is thus clear that, even when the Commissioner is wearing the hat of a rehabilitator, he is performing the duties—albeit not the usual ones—of the State Insurance Commissioner.

By statute, "[t]he Commissioner shall be represented by *the* Attorney General, *an* assistant Attorney General, or *another* attorney at law designated by the Attorney General." Code (1995, 1997 Repl.Vol.), § 2-201(b) of the Ins. art., Vol. 1

(emphasis added). The statute does not suggest that the Commissioner should be represented by one attorney when he is performing his usual duties and another when he is acting as rehabilitator of a troubled insurer.

Although the appellants expressly take issue with the conduct of the assistant Attorney General, it is apparent that they are actually offended by the Commissioner's dual roles. In enacting the statutes regarding receiverships for troubled insurers, the General Assembly was well aware that the Commissioner would be required to perform two functions, and that persons other than the Commissioner *could* serve as receivers. *See* Code (1995, 1997 Repl.Vol., 1999 Repl.Vol.), § 9–213 of the Ins. art., Vol. 1 (providing, upon motion of the court or the Commissioner, for the appointment of a person other than the Commissioner as receiver). It nevertheless provided that, under ordinary circumstances, the Commissioner would be appointed receiver.

Maryland's statutory scheme is based, in substantial part, on the Uniform Insurer's Liquidation Act. *See* 13 U.L.A., *Uniform Insurers Liquidation Act* at 321 and Cum.Supp. 110 (1986, 2000 Cum.Supp.). The "Prefatory Note" to the uniform act explains:

> In some states, the statutes provide that the Insurance Commissioner shall serve as receiver; in others, the courts appoint receivers as their discretion dictates. *In the latter states experience has shown that efficient administration is less likely to ensue.*

*Id.* at 322 (emphasis added). We are thus convinced that the General Assembly specifically directed that the Commissioner ordinarily be appointed receiver and that the Commissioner be represented by "*an* assistant Attorney General," § 2–201(b) of the Ins. art., Vol. 1, in order to best protect the public interest.

**JUDGMENTS AFFIRMED; APPELLANTS TO PAY THE COSTS.**